**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § § § | **COMPLAINT FOR FORFEITURE *IN REM*** |
| **v.** | § § | *CIVIL ACTION NO.* **26-cv-1386** |
| **APPROXIMATELY 3,034,907 USDT;** and **APPROXIMATELY 490,036 USDT,** | § § § § | |
| **Defendants, *in rem.*** | § § § | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against approximately 3,034,907.00 USDT and approximately 490,036.01 USDT, hereinafter collectively referred to as "Defendant Property," and alleges as follows:

## STATEMENT OF THE CASE

1. Criminals believed to be located abroad, their associates, and conspirators together stole funds from one or more victims. The funds were then laundered through a series of virtual currency addresses to evade detection and hide the origin of the funds. The United States Department of Justice, Federal Bureau of Investigation (FBI), investigated, traced, and seized the Defendant Property, which constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

## JURISDICTION AND VENUE

3.    This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.    This Court has subject matter jurisdiction over the Defendant Property under 28 U.S.C. § 1345, because the United States is the plaintiff, and 28 U.S.C. § 1355(a), because this is an *in rem* forfeiture proceeding.

5.    Venue is proper in this judicial district under 18 U.S.C. § 3238 and 28 U.S.C. §§ 1355(b) and 1395(a) and (b).

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6.    The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), 1956(h), and 2, and 3.

7.    Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.    18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.    18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to any offense, or a conspiracy to commit an offense, constituting "specified

unlawful activity" as defined by 18 U.S.C. § 1956(c)(7). A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A), by way of 18 U.S.C. § 1961(1)(B).

10.    18 U.S.C. § 1343 provides in relevant part that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," commits the violation of wire fraud.

11.    18 U.S.C. § 1349 provides in relevant part that whoever "attempts or conspires to commit [a violation of 18 U.S.C. § 1343] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

12.    18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.    18 U.S.C. § 1956(a)(2)(B)(i) provides in relevant part that "[w]hoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds

of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," commits international money laundering.

14. 18 U.S.C. § 1956(h) provides that "[a]ny person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

## **PROPERTY INFORMATION**

15. The Defendant Property comprises the following amounts of the virtual currency Tether (USDT):

a. approximately 3,034,907.00 USDT, valued at approximately $3,034,907.00 in U.S. dollars (USD), an equivalent amount of which ("Subject Currency A") was previously associated with virtual currency address 0x05FEe494A5cAD110357786C7fD2D798d73e97d5a ("Subject Address A"); and

b. approximately 490,036.01 USDT, valued at approximately $490,036.01 USD, an equivalent amount of which ("Subject Currency B") was previously associated with virtual currency address 0x910FAe0636883234a435b00fb32A194caB00fc90 ("Subject Address B").

16. Tether International S.A. de C.V. ("Tether") destroyed or "burned" Subject Currency A and B and reissued the Defendant Property to a United States law enforcement-controlled virtual currency address.

17. The Defendant Property is currently in custody and control of the United States.

**STATEMENT OF FACTS**

**Background on Cryptocurrency**

18.    Virtual Currency: Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

19.    Blockchain: A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For

example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

20.     Blockchain Analysis: Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

21.     Virtual Currency Address: A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

22.     Virtual Currency Exchange: A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

23.     Virtual Currency Wallet: A virtual currency wallet (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive

virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

24.     Unhosted Wallet: An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

25.     Hosted Wallet: A hosted wallet, also known as a custodial wallet, is a virtual currency wallet through which a third party, e.g., a virtual currency exchange, holds a user's private keys. The third party maintains the hosted wallet on its platform akin to how a bank maintains a bank account for a customer, allowing the customer to authorize virtual currency transactions involving the hosted wallet only by logging into/engaging with the third party's platform.

26.     Decentralized Exchange: A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated by self-executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

27.     Transaction Fee: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions.

Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

28.     Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

29.     Tether: Tether International S.A. de C.V. is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

30.     Ether: Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

**Background on Cryptocurrency Investment Fraud**

31.     FBI is investigating cryptocurrency investment fraud ("CIF") schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2025 alone, more than 61,500 complaints of CIF were received by the FBI's Internet Crime Complaint Center (IC3), resulting in more than $7.2 billion in reported

losses.[2] CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia.

33.    In CIF schemes, criminals contact potential victims through seemingly misdirected text messages, dating applications, or other online platforms/forums with the goal of building rapport and relationships with the victims.

33.    Once that trust is established, the criminal recommends virtual currency investment by touting their own, or an associate's success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject usually instructs and/or assists the victim with opening an account on a centralized virtual currency exchange, such as Coinbase or Crypto.com, and then walks the victim through transferring money from a bank account to that virtual currency exchange account. Next, the victim will usually receive instructions on how to transfer their virtual currency assets to the fake investment platform. On its surface, the platform typically shows lucrative returns, encouraging further investment. However, in reality, all deposited funds are routed to a virtual currency address controlled by the criminals—the "butchering" phase of the scheme. A visual depiction of the general pig butchering scheme is shown below in Figure 1.

---

[2] *See* Fed. Bureau of Investigation, Internet Crime Report 2025, https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf

*Figure 1*



34.    In CIF schemes, the subjects will continue to encourage investments until victims have depleted their savings. Oftentimes, the subject will attempt to continue the scheme by coaching victims on taking out loans against their homes or borrowing money from friends and family. Inevitably, these victims generally run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

**Wire Fraud Schemes**

*Victim K.T.*

35.     The Defendant Property constitutes or derives from proceeds of CIF. There were multiple iterations of the wire fraud scheme and numerous victims of those schemes, but the schemes all followed the general pattern described above.

36.     In or around July 2024, victim K.T., a San Diego resident, met a woman named Alice on penpal.com when trying to find a friend with whom to practice speaking English. Alice suggested they move to WhatsApp[3] to communicate.

37.     Once on WhatsApp, Alice told K.T. about her uncle who analyzed cryptocurrency markets data using artificial intelligence (AI). According to Alice, her uncle worked with other big players in the cryptocurrency industry to create "short-term trading opportunities" with "90% winning" rates.

38.     Alice introduced K.T. to the purported trading platform used by her uncle, Taurexs, which was hosted at a website. K.T. established a Taurexs account and began trading with guidance from Alice on when and how much to trade.

39.     Since December 2024, the Internet Crime Complaint Center (IC3) received at least 29 complaints for cryptocurrency investment fraud referencing Taurexs as the suspect platform. The total estimated victim loss from those complaints was $5.8 million.

40.     In addition to messaging with Alice, K.T. communicated with Taurexs customer service[4] in a WhatsApp channel. K.T. sent funds from their personal bank account to Coinbase, then to a wallet address provided by Taurexs customer service. Taurexs customer service then purportedly

---

[3] WhatsApp is a communications platform with end-to-end encryption. This encryption makes it a common mean of communication in cryptocurrency scams.
[4] "Customer service" as used herein refers to members of the CIF conspiracy posing as customer service or customer support representatives for the platform used and controlled by the conspirators in furtherance of the fraud scheme.

deposited the funds into K.T.'s personal Taurexs account. Once K.T. began making trades with Alice's guidance, K.T. saw their purported account balance grow quickly. At first, K.T. did not trust Alice, but after seemingly winning a few trades and feeling their account was secure, K.T. continued to send money to the platform.

41. When K.T.'s Taurexs account balance was small, K.T. was able to withdraw funds from the platform with no issues. When K.T. attempted to make a large withdrawal, however, Taurexs levied a series of fines, fees, and taxes on K.T, beginning with a 15% channel fee. Taurexs claimed this fee could not be debited from the Taurexs balance and must be paid by a separate transfer. K.T. canceled the withdrawal request and made a new withdrawal request for a lower amount, but Taurexs customer service asked K.T. to withdraw the full account balance instead. Taurexs customer service told K.T. to pay a handling fee of 166,661.604 USDT for the full account balance withdraw. K.T. paid the handling fee and still did not receive their funds.

42. Next, Taurexs claimed K.T. must pay taxes on the gains before the funds could be released. K.T. paid the taxes, but Taurexs did not release the funds. Taurexs customer service was unable to complete the transfer because of an alleged wallet issue. Taurexs accused K.T of making an operational error causing the funds to be "stranded" and charged K.T. $50,000 for recovery of the funds. K.T. paid this fine as well.

43. By August 2025, the balance in K.T.'s Taurexs account appeared to contain approximately $2.6 million. K.T. attempted to withdraw their funds again. To prepare for the withdrawal, Taurexs customer service sent a test amount of $500 and K.T. successfully received it in their Coinbase wallet. However, the full transfer of $2.6 million was unsuccessful. Coinbase told K.T. the $2.6 million transfer contained a fake token. Once again, Taurexs customer service told

K.T. they must pay taxes and a fee to make the funds usable. K.T. was never able to withdraw their funds.

44.    K.T. sent funds from savings accounts and stock sales. When K.T. could not sell any more stocks, K.T. withdrew from their Individual Retirement Account (IRA) and took out a loan to pay the channel fees, taxes, and service fees. K.T. was unable to recover any of their funds from this fraudulent platform and lost a total of approximately $1.7 million, which severely compromised their life savings and financial future.

45.    K.T.'s experience with Taurexs follows a common pattern used by perpetrators of CIF schemes. In CIF schemes, some platforms will allow victims to make small withdrawals, to induce confidence in the platform and encourage victims to invest additional funds. When victims appear to be at the end of their ability to invest and show interest in making larger withdrawal attempts, CIF perpetrators will levy various taxes, fees, and fines upon the victim. CIF perpetrators claim that if these fees are paid, then the victim can withdraw their entire investment and all profits. This is, however, actually a last-ditch effort to steal from victims.

*Victims K.B., K.H., and G.P.*

46.    Victims K.B., K.H., and G.P. were victimized by a CIF scheme referred to as the Lakshmi Finance Center (Lakshmi).

47.    K.B. began investing with Lakshmi, which claimed to use artificial intelligence (AI)-based trading signals for high returns. K.B. joined a Telegram[5] thread with other potential investors and Jonathan Dale Benton ("Benton"), who called himself "The Professor." In the Telegram thread, Benton showed how well the AI model performed and asked for investments into the token, LTT. In addition, K.B. communicated individually on Telegram with an individual named Olivia, who sent

---

[5] Telegram (also known as Telegram Messenger) is a social media and communications platform with end-to-end encryption available for voice and video calls, as well as private chats.

step-by-step screenshots on how to send funds from K.B.'s personal bank account to Coinbase or Crypto.com and then to Lakshmi's investment platform hosted on OV Finance. OV Finance had both a URL and an App version called Ovenix.

48.     Within OV Finance, K.B. established an account and the wallet addresses appeared to be in K.B.'s control, which increased confidence in the platform. One night, K.B. made a trade and their account balance went to zero. Olivia said the market was volatile that night and that night trades were only for those who invested over $1 million. Olivia told K.B. that the only way to recoup the losses was to send more funds. If K.B. invested $500,000, then Lakshmi would match it, and K.B. would recoup the account balance. K.B. told Olivia they did not have the funds. In total, K.B invested approximately $400,000, including $100,000 from K.B's mother, and has been unable to recover any of their investment.

49.     Victim K.H. was added to two cryptocurrency investing groups in WhatsApp: Lakshmi Finance Center 777 and Richard Invest Pro Group E3 ("Richard"). As with K.B., the leader of Lakshmi was Jonathan Dale Benton (Benton), who called himself "The Professor." K.H. messaged separately on WhatsApp with an individual in the Lakshmi group named Casey Ross. To invest in Lakshmi, K.H. established an account at www.chameleonfinance.com where K.H clicked a link to obtain a deposit wallet address. K.H. moved funds from a personal bank account to Coinbase and then to Lakshmi. K.H. was able to make two withdrawals, one for $10,000 and another for $5,000, which built trust. However, when K.H. attempted to make subsequent withdrawals, Lakshmi froze their account claiming K.H. broke anti-money laundering laws and sent funds to a suspicious address. K.H's  account was locked for seven days. Once the account unlocked, K.H. was able to withdraw only $423. In total, K.H. invested approximately $175,000 and has not been able to withdraw the full account balance.

50.     The second CIF scheme with which K.H. was involved—Richard—promoted buying stock at institution discounts at the website, Stockyis.com (Stockyis). K.H. was added to the Richard WhatsApp group run by Professor Richard Cornell, and K.H. communicated with an individual named Alicia in a separate WhatsApp chat as well. The Richard WhatsApp group provided ticker symbols to trade at specific times of day to make the most profit and incentivized higher investment amounts for added benefits. K.H. attempted to withdraw $500,000 from their account balance, but Stockyis claimed the withdrawal had to go through an approval process and there was a limit to the withdrawal amount. K.H's account showed a successful transfer with a transaction hash, but it contained a fake token and no funds were returned to K.H. In total, K.H invested approximately $500,000 in Stockyis and has been unable to recover any of their investment.

51.     Victim G.P. fell victim to two CIF schemes: Lakshmi and Spire Exchange ("Spire"). As with K.B. and K.H., the leader of Lakshmi was Professor Jonathan Dale Benton. Benton also had an assistant, Diana Allison. Benton claimed to have a partnership with Blockchain Financial (BCF), which focused on cryptocurrency investing because the stock market was down. G.P. received a link to BCF on Telegram and established an account. Funds moved from G.P.'s personal bank account to Coinbase and then to BCF. BCF promoted an option of moving $25,000 from the BCF balance into a high-yields account that earned 11.5%, which would be released after a certain date. The remaining account balance grew and then went to zero. G.P. asked to withdraw at least the $25,000 from the high-yields account, but BCF refused, claiming G.P. wanted to send the funds to a suspicious address. BCF claimed G.P. could not withdraw their funds because G.P. needed to execute more trades. In total, G.P. invested approximately $105,000 in Lakshmi and has been unable to recover any of their investment.

52.     In addition, G.P was contacted via WhatsApp by another investment group. The leader of the group was Charles Bennett ("Bennett"), who claimed to partner with the cryptocurrency platform, Spire. Spire investors received trade signals, and everyone traded for the same three-minute period daily. The inflows from the investors drove the gains 30% higher. Bennett provided instructions on how to move funds from a personal bank account to Coinbase to Spire Exchange. When G.P. tried to withdraw $77,000, Spire denied the request claiming G.P. violated anti-money laundering laws. After attempting an afternoon trade, G.P.'s entire account balance went to zero. In total, G.P invested approximately $77,000 and has been unable to recover any of their funds.

*Other Victims*

53.     Victims M.W., S.S, C.C., A.P., J.C., D.G., D.Q., S.B., E.L., A.B., J.M., L.S., J.M.(2), A.D, R.W., J.H., H.Z., J.H.(2), M.J, X.H., S.M., and A.S. were all victimized in CIF schemes similar to what K.T. experienced.

54.     Victims M.W., S.S., and C.C. met individuals online who convinced them to invest in the MIC Market platform. When M.W. requested to withdraw their funds, MIC Market customer service claimed M.W. had to pay a 15% margin fee within 15 days or pay 1% penalty, and M.W. paid. Next, customer service requested M.W. pay 37% for taxes or face a 1% per day penalty. In total, M.W. invested approximately $400,000 and has been unable to recover any of their investment.

55.     Victim S.S. began communicating with Charles Leroy (Leroy) on WhatsApp. Leroy provided the uniform resource locator (URL)[6] to MIC Market, and guided S.S. step-by-step on how to trade. S.S. always made gains. After investing $550,000 of S.S.'s savings, Leroy advised S.S. to withdraw the whole balance. S.S. was surprised to learn there was a 10% withdraw fee. Leroy made S.S. believe it was a one-time fee and then S.S. could withdraw, so S.S. drained the rest of their

---

[6] A URL is a specific character string constituting a web address used to locate resources such as websites, images, and documents on the internet.

16

savings to pay the fee. Next, MIC Market customer service told S.S. she must fulfill anti-money laundering obligations by paying $300,000. After customer service reviewed S.S.'s account for compliance, the $300,000 would be returned. In total, S.S. invested approximately $537,000 and has been unable to recover any of their investment.

56.     Victim C.C. met Anthony on Tinder[7] and Anthony moved the conversation to WhatsApp. Anthony claimed to trade in gold using a platform called Mic Market. Anthony told C.C. to download the application, ACMJ, from the App Store to begin trading gold futures on Mic Market. Mic Market also had a website, pc.micmarketsfx.cc. Anthony guided C.C. on how to set up and navigate to their wallet within Mic Market. C.C. moved funds from their personal bank account to Crypto.com, Coinbase, and Robinhood, and then to Mic Market. Once Mic Market customer service received the funds, they would move the funds into C.C.'s personal wallet and C.C. could see the funds in the account. Anthony provided instructions on how to trade based on market volatility and C.C. saw their account balance increase. When C.C. attempted to withdraw after making a large deposit of approximately $171,000, customer service denied the withdrawal claiming C.C. needed to pay a 12% tax on their profits. In total, C.C. sent approximately $313,000 to Mic Market and has not been able to withdraw their funds.

57.     Victim A.P. received a seemingly misdirected text from Josie and began conversing. Josie moved the conversation to Telegram and introduced the cryptocurrency platform XCEX. Josie claimed XCEX was an exclusive platform and provided the link for A.P. to create an account. Josie showed A.P. how to transfer funds from their personal bank account to Discover Bank or Coinbase and then to XCEX. On Telegram, an XCEX support account provided the wallet addresses to A.P. and A.P. saw their investments reflected in their XCEX account. A.P. tried to withdraw their entire

---

[7] Tinder is an online dating and geosocial networking application

XCEX account balance, but XCEX claimed that a withdrawal over $100,000 required a 5% financial service fee that could not be deducted from the balance. A.P. paid the financial service fee with help from Josie. Next, XCEX claimed A.P.'s XCEX account executed illegal trades and engaged in insider trading. A.P. had to pay a penalty of 100% of the illegal profits to unfreeze the account. Then, XCEX informed A.P. that their account credit score dropped 30 points and A.P. must restore the credit score to withdraw funds. In total, A.P. invested approximately $145,000 of personal savings and loans and has been unable to recover any of their investment.

58.     Victims J.C. and D.G. began investing in cryptocurrency after receiving a seemingly misdirected text from Ivy Yang (Yang). J.C. was interested in investing in gold, but Yang insisted cryptocurrency was better, claiming Yang and her aunt had great success with cryptocurrency. Yang told J.C. to contact a company called Ulinks to fill out a loan application for $100,000 to invest in cryptocurrency. J.C. was surprised that Ulinks would give a $100,000 loan to a retired individual living on a fixed income. J.C. had 90 days to pay off the loan, and Yang claimed she would help J.C. pay off a portion of the loan. When J.C. attempted to withdrawal funds from their Ulinks account, J.C. was told they had to pay $100,000 in taxes. In total, J.C. invested approximately $40k-60k and has been unable to recover any of their investment.

59.     Victim D.G. and Yang discussed investing in gold and Yang guided D.G. in how to send funds to the application, Ulink Pro. The transactions flowed from D.G.'s bank account to Coinbase or Discover Bank and then to cryptocurrency wallet addresses in Ulink Pro provided by Yang. After President Trump's inauguration, Yang claimed new fees went into effect, which Ulink paid for D.G., and D.G. needed to reimburse. The fees were 10% of what D.G. already invested, and D.G. made two transactions to pay the fees. In total, D.G. invested approximately

$200,000 and has been unable to recover any of their investment. D.G. is retired and the financial burden of the victimization has required D.G. to return to work.

60.    Victim D.Q. met an individual on the dating application, Tinder, who convinced them to invest in cryptocurrency on the short-term trading platform, onchain-bit.com/#/ (Onchain-bit). D.Q. was able to make a small withdrawal of $200 and this built trust with D.Q. D.Q. took out personal loans to invest in the platform to make larger gains. When D.Q. attempted to withdraw their funds, Onchain-bit customer service told D.Q. to pay a 10% withdrawal fee. D.Q. paid the withdrawal fee, but the funds did not arrive in their Coinbase account. Onchain-bit customer service claimed to detect multiple recharges, requiring a review of money laundering activities, and a deposit of 10% of the balance pending the review. In total, D.Q. invested approximately $195k and has been unable to recover any of their investment.

61.    Victim S.B. was contacted on WhatsApp by a female named Anastasia. S.B. and Anastasia engaged in romantic conversation and talked about buying a property together. Eventually, Anastasia convinced S.B. to invest in cryptocurrency on www.Flexitrd.com and taught S.B. how to deposit funds into the account, place trades, and navigate active trading times. When S.B. attempted to make a withdrawal, S.B. was told to pay a fee of $200,000 and S.B. refused. In total, S.B. invested approximately $800,000 and has been unable to recover any of their investment.

62.    Victims E.L., A.B., and J.M. invested in Web3 [8] platforms accessible through Onchain, a non-custodial wallet provider that facilitates access to decentralized applications. E.L. downloaded the application, Crypto.com: Onchain ("Onchain"), from the App Store, and created an account. Within Onchain, E.L. navigated to an unidentified platform on the Web3 portal to conduct trades and asked customer service about available smart contracts. Customer service claimed there

---

[8] Web3—also known as Web 3.0—often refers to internet infrastructure and applications which incorporate concepts such as decentralization, blockchain, and privacy-enhancing technologies.

were three smart contracts available for $1 million. After investing, customer service claimed E.L. failed to meet the pledge on the smart contract and now must pay a penalty. After E.L. paid the penalty, customer service then claimed E.L. moved funds out of the "power pool" and had to pay mining fees for attempting to withdraw a balance over $2 million. Next, customer service claimed E.L. owed 10% capital gains tax. In total, E.L. invested $500,000 from his IRA and an additional $500,000 from family members and has not been able to recover their funds.

63.     Victim A.B. met a woman named Vivian Smith (Vivian) online who encouraged them to invest in a liquidity reserve project on Web38.net, a platform accessible via the Onchain Web3 portal. Vivian taught A.B. how to set up a wallet on Web38.net and deposit funds into the account. Within Web38.net, A.B. messaged customer service to obtain the wallet addresses to add funds to a "computing pool." A.B. saw their investment increase. When A.B. attempted to withdraw funds, customer service claimed they had to pay mining fees and taxes to withdraw the funds. A.B. paid the fees and taxes and still did not receive their withdrawal. At this point, customer service claimed A.B. was assigned a highly lucrative smart contract even though A.B. never requested to join the smart contract. The most recent request to withdraw required another 10% mining fee for $257,000. Then, customer service charged more fees because they claimed to identify odd transactions that they had to investigate. In total, A.B. invested approximately $400,000 in Web38.net and has not been able to withdraw their funds.

64.     Victim J.M. met a female named Hetty Jones (Hetty) on an online dating site. Hetty moved the conversation to WhatsApp and introduced J.M. to cryptocurrency investing. Hetty claimed her aunt helped build a trading platform on Web3 called Web31.net. Hetty guided J.M. on how to move funds from their personal bank account to Coinbase to Onchain where they accessed the Web31.net platform hosted on Web3. J.M. sent approximately $168,000 to Onchain to invest in

Web31.net. When J.M. attempted to withdraw funds, customer service required J.M. to pay fines, fees, and taxes. In total, J.M. invested over $300,000 and has not been able to recover their funds.

65.    Victim L.S. fell victim to two CIF schemes. First, L.S. received a seemingly misdirected text from a female named Sarah, who moved the conversation to Telegram and introduced cryptocurrency. Sarah guided L.S. in moving funds from their personal bank account to Coinbase to ethercama.com, which Sarah claimed was a mining pool with high returns. Sarah provided the link to ethercama.com and L.S. established an account. When L.S. attempted to withdraw $500,000, customer service claimed L.S. had to pay a $58,000 "gas" fee. L.S. did not pay the fee because they did not have the funds. In total, L.S. sent approximately $500,000 to ethercama.com and has not been able to recover their funds.

66.    In the second CIF scheme, L.S. met Maya Smith (Maya) online and communicated with her in WhatsApp. Maya claimed to have an aunt involved in high level gold and silver trading. Maya guided L.S. in moving funds from a personal bank account to Coinbase to Taurexse.com. L.S. obtained the wallet addresses in WhatsApp from Taurexse customer service. Maya told L.S. when to buy and sell, and L.S. made 100% gains on the trades. Taurexse customer service issued a fine to L.S. for making 100% gains on every trade. L.S. paid the fine. Next, L.S. was informed they had to pay a compliance deposit or L.S. would be reported to FinCEN and the account would be frozen. When L.S. tried to withdraw funds, Taurexse customer service charged taxes. In total, L.S. sent approximately $300,000 to Taurexse and has not been able to withdraw any funds. L.S. lost their life savings to cryptocurrency investment fraud.

67.    Victim J.M.(2) received a seemingly misdirected WhatsApp message from a woman named Joyce Garcia (Joyce), a representative from Ares Financial Group (Ares). J.M.(2) was added to a large WhatsApp group offering the opportunity to invest in an Ares-managed platform offering

lucrative short-term trades. Joyce provided the URL, setsailshare.com, and J.M.(2) opened an account. J.M.(2) moved funds from their personal bank account to Coinbase and then to wallet addresses provided in the large Ares WhatsApp group. J.M.(2) sent approximately $20,000 using multiple transactions to setsailshare.com. At the time of balance withdrawal, Ares received a 5% commission and J.M.(2) was charged a third-party processing fee, which J.M.(2) paid. Next, Ares charged J.M.(2) a $20,000 anti-money laundering fee, and J.M.(2) paid it. Finally, Ares charged $27,000 in taxes before the withdrawal would be permitted, and J.M.(2) paid the taxes. In total, J.M.(2) sent approximately $96,000 to Ares and has not been able to withdraw their funds.

68. Victim A.D. made transfers from Coinbase to a wallet with the transaction note: "Need to be sent to my non-custodial wallet to store investments." The funds involved in these transfers passed through Tokenlon.im, which is a decentralized exchange which is frequently used in the laundering of CIF proceeds.

69. Victim R.W. met a woman named Vivian on a dating website and Vivian moved the conversation to WhatsApp. Vivian mentioned her aunt involved her in a cryptocurrency project with great returns. Vivian provided a Web3 platform, Web3I, to access via Onchain. R.W. moved funds from a personal bank account to Crypto.com or Coinbase to Onchain and finally to Web3I. When R.W. first tried to withdraw funds, Vivian suggested R.W. send $35,000 more to upgrade their status and make more money in a smart contract, and R.W. did. At the second attempt to withdraw, customer service claimed R.W. violated policy by sending funds using two different addresses, so R.W. needed to add more equity to their account to fix the issue. Then, R.W. had to pay a 30% mining fee and another 20% fee because R.W.'s account was flagged for unusual activity. During the next withdrawal attempt, customer service requested another $26,000. R.W. sent this payment to a new "VIP" address provided by Vivian, and R.W. was charged $40,000 because the payment was

sent from a different address. Customer service told R.W. they were a lucky winner and got $80,000 added to a new smart contract. R.W. did not want or agree to the contract, but customer service said R.W. needed to pay back the $80,000 anyway. In total, R.W. invested approximately $217,000 and has not been able to recover any of their funds.

70.     Victim J.H. met Alicia on a dating application and Alicia moved the conversation to WhatsApp. Alicia introduced an unidentified platform on Web3 that offered smart contracts. J.H. moved funds from their personal bank account to Crypto.com to Onchain and finally to the unidentified platform. J.H. received the wallet address for the smart contract from customer service. One day, J.H.'s account balance disappeared. J.H. reached out to customer service and they claimed J.H. was the lucky winner selected to join a 14-day smart contract. After the 14 days, customer service claimed J.H. needed to pay a $30,000 mining fee to access their funds. J.H. did not have any more funds to send. In total, J.H. invested approximately $40,000 to $60,000 and has not been able to withdraw their funds.

71.     Victim H.Z. met a woman on an online dating site who claimed to have an aunt who worked for Goldman Sachs and now trades in cryptocurrency. The woman provided step-by-step instructions on how to move funds from a personal bank account to Crypto.com to Onchain and finally to a specific, unidentified Web3 platform. On the Web3 platform, customer service provided wallet addresses for high-yielding smart contracts. H.Z. invested $59,000 in Web3 and the woman claimed to place $70,000 of her own funds into the smart contract. The woman asked H.Z. to invest $20,000 more to reach the $150,000 investment level for more gains. H.Z. did not have the funds to pay the additional $20,000. In total, H.Z. invested approximately $59,000 and has not been able to withdraw their funds.

72.    Victim J.H.(2) began talking to a woman named Anna using an online dating service, and Anna moved the conversation to WhatsApp. Anna mentioned her rich aunt and how she made millions through crypto. J.H.(2) decided to invest and asked Anna to train them on how to trade in cryptocurrency. Anna provided detailed instructions on what application to download, what to click, and where to send funds. J.H.(2) moved funds from their personal bank account to a cryptocurrency exchange, and then Anna instructed J.H.(2) to transfer all of their funds to Taurexse. J.H.(2) made many attempts to withdraw their funds but was unsuccessful. In total, J.H.(2) invested approximately $100,000 and has not been able to withdraw their funds.

73.    Victim M.J. was contacted online by a woman named Gina who was previously unknown to him. M.J. and Gina formed a relationship, and eventually Gina introduced the platform, Tickmill, which she claimed she used for gold trading. Gina provided guidance on how to download the application, DFIECFRDR, to access Tickmill. Gina provided the URL for Tickmill and sent screenshots on how to create an account and transfer funds from a cryptocurrency exchange to Tickmill. M.J. saw their Tickmill balance increase. When M.J. attempted to withdraw $6,000, Tickmill denied the withdrawal. M.J. thought it was odd, but temporary, so they continued to send funds to Tickmill. M.J. attempted another withdrawal for $30,000, but Tickmill rejected the withdrawal because of an account abnormality. Customer service claimed M.J. deposited funds from multiple accounts and charged M.J. a fine equal to 10% of the account balance. M.J. did not pay the fine. In total, M.J. invested approximately $87,000 and has not been able to withdraw their funds.

74.    Victim X.H. met a man on Tinder and he moved the conversation to WhatsApp. The man directed X.H. to download Coinbase and an additional application through which he would help X.H. invest their newly purchased cryptocurrency. The man provided step-by-step instructions on how to move money from a personal bank account to Coinbase and then to the provided investment

application. X.H. contacted a company in Hong Kong who they thought owned the investment application, and learned the application was fraudulent. X.H. asked the man how they could get their money back, but the man told X.H. he could not give the money back. In total, X.H. invested at least 199,612 USDT, equivalent to approximately $199,612 USD, and has not been able to withdraw their funds.

75. Victim S.M. received a seemingly misdirected text from a woman name Kelly, and Kelly moved the conversation to WhatsApp. Kelly introduced a gold investment opportunity through BTCBOX. S.M. moved money from their personal bank account to Crypto.com to another crypto exchange and eventually to wallet addresses provided by BTCBOX's customer service Telegram channel. S.M. and their spouse sold stocks and used money from their 401(k) to invest in BTCBOX. When S.M. attempted to withdraw funds, S.M. had to pay $60,000 in fees to fully withdraw their funds. In total, S.M. sent approximately $1,085,000 to BTCBOX and has been unable to withdraw their funds.

76. Victim A.S. met a woman named Megan Mullaly who introduced the investment platform, http:web38.net/wallet. A.S. accessed web38.net through Onchain and invested $50,000 in the platform. A.S. woke up one day to find their $52,000 account balance was gone and A.S. has not recovered their funds.

<b>Money Laundering Scheme</b>

77. Each of the victims identified above believed they were sending virtual currency into a secure address in an account held for their benefit. In fact, the victims were induced to send virtual currency to addresses controlled by fraudsters. The stolen virtual currency was quickly laundered through a series of transactions on the blockchain designed, at least in part, to conceal and disguise the nature, location, source, ownership, and control of the CIF scheme. After a series of transactions,

the stolen virtual currency from victims K.B., K.H., and G.P was consolidated with virtual currency from other sources in Subject Address A. The stolen virtual currency from the remainder of the victims was consolidated with virtual currency from other sources, including from other confirmed and suspected victims, in a single address: 0x928b8864151ee6C1E057964460bf5c7ADDbcA97f (the "Consolidation Address"). The Consolidation Address only received USDT from unhosted addresses, which is consistent with addresses used by perpetrators of CIF. The Consolidation Address then separately sent funds to Subject Address A and Subject Address B. The paths from the victims to the Consolidation Address, Subject Address A, and Subject Address B are further described below.

*Flow of K.T.'s Funds to the Consolidation Address*

78.     On or about July 16, 2025, K.T. made an initial transfer of 126,241 USDT from their Coinbase wallet to an unhosted wallet address. On or about July 22, 2025, K.T. made another deposit of 125,200 USDT to the same address.

79.     Within two days of each deposit from K.T.'s Coinbase account to the unhosted address, the funds were transferred through multiple intermediary addresses, comingled with other funds along the way, and ultimately transferred into the Consolidation Address. A visual depiction of the path from K.T.'s Coinbase account to the Consolidation Address is shown below in Figure 2.

///

///

///

*Figure 2*



80.    The above flow of funds is indicative of money laundering. At each stage above, various methods were used by criminals to thwart law enforcement's ability to trace, and ultimately recover, any illicit proceedings. Those methods include:

a.    *The Use of Unattributable "0 Level" Deposit Addresses (0x03b28c, Figure 4)*. 0 Level addresses are the initial deposit addresses in which victims deposit funds on the blockchain. These addresses are provided to victims by the criminals. Because of this, criminals usually provide unhosted wallets as 0 Level addresses to evade identification or potential interference. Such is the case here with 0x03b28c. Additionally, these 0 Level addresses are oftentimes only shared with one victim to reduce the likelihood that their address is flagged to law enforcement.

b.    *High Velocity Flow of Funds (numerous addresses, Figure 4)*. Once deposited into the 0 Level Address, it is common for the funds to flow quickly from address to address before reaching a consolidation wallet, where the funds might rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again towards a cash-out point where they can convert the pool of funds to fiat currency. K.T.'s funds reflect this method on numerous occasions by being transferred into, and out of, an address within hours or even minutes.

c.    *Use of Consolidation Addresses to Comingle Funds (0xa44b39, 0x3efaa3, 0x928b88 Figure 4)*. Defined as the "layering" stage of money laundering, funds derived from multiple victims are routed to the same address, where they are comingled, consolidated, and transferred together. Criminals use consolidation wallets to obfuscate the source of funds and complicate tracing efforts by investigators. K.T.'s funds were comingled with funds of multiple other

28

victims and ultimately passed through multiple consolidation wallets before entering Consolidation Address.

81.     There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Whether transferring Bitcoin (BTC) or USDT, each individual cryptocurrency transfer costs money. For USDT on the Ethereum blockchain, that cost comes through the payment of transactions fees, or "gas" fees, required by the Ethereum blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of the key attributes of virtual currency as a quick means of exchange.

*Flow of Funds from Additional Victims to the Consolidation Address*

82.     Virtual currency originating from victims M.W., S.S, C.C., A.P., J.C., D.G., D.Q., S.B., E.L., A.B., J.M., L.S., J.M.(2), A.D, R.W., J.H., H.Z., J.H.(2), M.J, X.H., S.M., and A.S. also made its way to the Consolidation Address. The flow of funds from these victims is consistent with the flow of funds from K.T. and incorporate many of the same attributes of money laundering.

83.     Including the flow of funds from the known victims identified herein, the Consolidation Address conducted approximately 708 transactions through which it received and sent approximately over 57,500,000 USDT. The tracing of funds described and visualized in this Complaint focus primarily on the funds that were later transferred to Subject Addresses 1–5.

84.     A visual depiction of the path from victim S.M.'s Crypto.com account, and from victims A.P.'s and A.D.'s respective Coinbase accounts, to the Consolidation Address is shown below in Figure 3.

///

*Figure 3*



85.    A visual depiction of the path from victim C.C.'s Robinhood account, and from victims M.W's, S.S.'s, D.Q.'s, M.J.'s, and X.H.'s respective Coinbase accounts, to the Consolidation Address is shown below in Figure 4.

*Figure 4*



86.    A visual depiction of the path from victims J.M.(2)'s, D.G.'s, J.C.'s, and S.B.'s respective Coinbase accounts, to the Consolidation Address is shown below in Figure 5.

*Figure 5*



87.    A visual depiction of the path from victim E.L.'s Kraken account, from victims J.H.'s, A.S.'s, H.Z.'s J.H.(2)'s, and R.W.'s respective Crypto.com accounts, and from victims J.M.'s, L.S.'s, and A.B.'s respective Coinbase accounts, to the Consolidation Address is shown below in Figure 6.

*Figure 6*



88.    A chart detailing the total reported loss each of the foregoing victims suffered, together with the portion of those losses traceable to the Consolidation Address, is shown below in Figure 7.

*Figure 7*

| Victim | Loss Traced (USDT) | Total Reported Loss ($) |
|---|---|---|
| K.T. | 225,200 | $1,773,894 |
| M.W. | 145,516 | $1,290,545 |
| S.S. | 331,817 | $965,000 |
| A.P. | 39,755 | $145,400 |
| J.C. | 32,421 | $40,000 |
| D.G. | 14,196 | $200,000 |
| D.Q. | 69,798 | $247,900 |
| S.B. | 222,700 | $800,000 |
| E.L. | 100,000 | $1,000,000 |
| J.M. | 24,976 | $168,000 |
| L.S. | 50,157 | $800,000 |
| A.B. | 49,476 | $400,000 |
| J.M. (2) | 27,000 | $96,000 |
| A.D. | 49,966 | $49,966 |
| R.W. | 23,797 | $217,000 |
| J.H. | 29,018 | $40,000 |
| H.Z. | 24,604 | $59,000 |
| C.C. | 267,970 | $313,000 |
| J.H. (2) | 98,304 | $100,000 |
| M.J. | 86,491 | $87,000 |
| X.H. | 199,612 | $199,612 |
| S.M. | 171,854 | $1,085,000 |
| A.S. | 44,854 | $50,000 |
| **TOTAL** | 2,329,482 | $10,127,317.00 |

89.    In total, these victims have reported the loss of approximately $10,127,317.00. Many of them have pulled funds out of their retirement accounts to invest, borrowed funds from family, or are elderly and now forced to leave retirement to pay their bills in the aftermath of the scam.

90.    The activities, patterns, and associations in the Consolidation Address are indicative of laundering proceeds of CIF schemes. Some of those activities, patterns, and associations include:

a.    *Overall lifespan and volume of the Consolidation Address:* The Consolidation Address was active between June 2025 through July 2025 and received and sent over 57,500,000 USDT during this short time period.

b.    *Exposure to Scams and Another Seizure Warrant:* The Consolidation Address has significant indirect receiving exposure to addresses flagged as scams or associated with stolen funds. Indirect receiving exposure refers to funds that came from a flagged address but transited through at least one other address before reaching the destination. Specifically, the Consolidation Address conducted transactions with 172 address clusters[9] believed to be connected to CIF schemes. A list of the reported scam websites and applications associated with the address clusters is shown below in *Figure 8.* These scam clusters come from a reliable blockchain analytics tool.

*Figure 8*

| Scam Cluster |
|---|
| COINHAPRO.vip |
| BITTRADE-ZOOMEX.com |
| THELEOAPP.net |
| H5.OKE-VIP.com |
| TRUST-METATRADING-WEB3.com |
| truecommerce.live |
| PC.BAAZEXFX.cc |
| apten.life |
| TAMADOGE.top - API |
| firephoenixfx.com |
| PC.BITMCLIMIFX.com |
| MS.OEJBKSN.com |
| COINHORIZON.xin |
| user.frtcnet.live |
| Fake TradingView App Pig Butchering 0xdd33C |
| lmax.la |
| B9EXS.com |
| ORVGPRO.com |
| Scam 0x032cfF1C |

---

[9] A 'cluster' is a collection of addresses that is assessed to be held in the same wallet or controlled by the same entity.

35

| |
|---|
| gm-enkonix.vip |
| BSIHENO.com |
| Bitkanant Scam 0x96C93A |
| Mine Z Scam Hop 1 0x7a102B |
| TAMADOGE.top |
| evyvf.top |
| gateexin.com |
| FINANIS.com |
| NYBEXC.com |
| cmw2021.com |
| gateexproq.com |
| address poisoning 0x4668EE |
| KK Park Scam Consolidation 0x77dD8Af by GASO |
| HUIBETD.com |
| fxcmrsa.com |
| Contact Chainalysis - Investment Scam |
| c-patexco.com |
| dydx-vip-defi.com |
| Tiger Coin |
| KK Park Scam Consolidation 0x7a96D8 by GASO |
| Tosal-fx.com |
| COINXIO.com |
| coinupit.site |
| bilaxy.tv |
| BTSEPRO.com |
| Scam 0x25994695 |
| eiham.com by zeroShadow 0x36b07D |
| LEADTECH.live |
| metechains.co |
| zlfcr.xyz |
| nyseexe.com |
| indoxjud3.top |
| defion.co |
| connect-ethereum.com |
| coinxio.com |
| eth-defi10.com |
| TRUST-PC.pro |
| WORLDEXST.com |
| usdt-intrust.com |
| CP-BERAGE.top |
| oua.snxbvvq.xyz |
| GateExPro.com |

| |
|---|
| UIFIC.com |
| bitvavtios.co |
| Sunton Capital |
| bijsi.com |
| eth-panda.vip |
| coindeskex.com |
| coindeskex.org |
| jbcoin-ex.com |
| BTCTuroB2C.com |
| investment scam 0x737bd2 |
| BTM.RJKKDF.com |
| scam 0x371330aa |
| sjfuturefx.com |
| Scam 0x7Ee96739 |
| futuresvke.com |
| SunacFX.com |
| neptuneexchange.com |
| coinmog.net |
| defiearn-vip.com |
| ZBGOpt.com |
| Scam 0x64790d3D |
| ZAIF-GLOBAL.vip |
| ATOMANY.com |
| imcoinbase.xyz |
| sushidexfi.com |
| leverjdefi-concept.com |
| eastpac.live |
| CMEGroupLib.com |
| usdt-ether.me |
| ftxzzlines.com |
| sundell-fx.com |
| skyamltd.com |
| SWFTXIN.com |
| ainks66.xyz |
| carrodsecurities-ltd.com |
| cgwebs1.com |
| token.im |
| antsex.com |
| encryption.bet |
| hrkj8.com |
| WORLDEX.UJNHT.com |
| icmsifx.com |
| CoinRule-Web3.life |

| |
|---|
| bitmaster8.com |
| BITYARD-U.com |
| suntonfx.com |
| tetherpool.top |
| DERIBITGLOBALS.com |
| cde.psdn123.xyz |
| bqbex.top |
| cwg-ltd.com |
| mokfxm.com |
| ethusdt.co |
| arftxbot.com |
| ArcoinLib.com |
| youtuex.com |
| ZOOMEX-LINK.com |
| sbivct.coom |
| PIMCOMG.com |
| dfswnr7utjm.vip |
| Scam 0xE09552D0 |
| dotex.vip |
| ICEPX.com |
| bitmart-trust.com |
| MBIToken.com |
| BairradaForex.com |
| virgo.eth.com |
| itbitua.com |
| spreadexs.com |
| BKEXAim.com |
| winwincoin.me |
| esdxcf.com |
| KKCoinSC.com |
| bdexet.com |
| ntucapital.com |
| bigone-eth.com |
| ant-cb.com |
| mywebull.net |
| HOUTAI.SOENKD.com |
| USDT-Finance.org |
| COINDOEX.top |
| Scam 0x69315653 |
| BYBITOHS.com |
| kinepro.vip |
| job scam 0xbD1C688B |
| taskhashex.com - COINHERO |

| |
|---|
| h5.decurretpro.com |
| FINCAX.com |
| OMGOS.vip |
| GalaxyGlobalPro.net |
| Scam 0x8fdcaed9 |
| dydx-s.com |
| GammaEx.net |
| BITRUEACC.com |
| bnbdt.pro |
| tokenplace.vip |
| willfxvip.com |
| wardirectory.com |
| HKEXPRO.xyz |
| PC.TRIVEPROLIMITED.com |
| Contact Chainalysis 0xff6ed3 |
| jocfinancial.online |
| JumperFX.club |
| JuicyFields.io |
| Coinbase Impersonation Scam 0x7749f2 |
| kpdwpl785.top |
| sodglobal.cc |
| mokfxm.com |
| scam 0xC5BC172 |
| h5.lglwzyb.top |
| BITVAVO888.com |

*Flow of Funds from the Consolidation Address to Subject Addresses A and B*

91.     Subject Address A received at least 1,906,425 USDT from the Consolidation Address after passing through two additional addresses in quick succession. Subject Address B received approximately 490,025 USDT from the Consolidation Address, which was approximately 100% of the seized balance. A visual depiction of the path from the Consolidation Address to Subject Addresses A and B is shown below in Figure 9.[10]

---

[10] Subject Address B received the majority of its balance from the Consolidation Address via an intermediary address. Approximately 30 USDT transferred directly from the Consolidation Address to Subject Address B**.** This small transaction is not depicted in Figure 9.

*Figure 9*



*Flow of Funds from Victims K.B., K.H., and G.P. to Subject Address A*

92.     In addition to receiving CIF proceeds from the Consolidation Address, Subject

Address A received funds from victims K.B., K.H., and G.P. through an alternate path. A visual

depiction of the path from these victims to Subject Addresses A is shown below in Figure 10.

*Figure 10*



41

93.     Subject Address A has zero withdrawals but five deposits totaling 3,034,907 USDT, all from the same address: 0x9543B4f725938483dE4517099aC4ec60808913cd (0x9543B4). The first deposit was sent to Subject Address A on or about July 18, 2025. 0x9543B4 has moved over 8,000,000 USDT and appears to be another address used to consolidate victim funds and move them again in bulk transactions. Like the Consolidation Address, 0x9543B4 also received funds from clusters of addresses identified as being related to scams. For example, 0x9543B4 received funds from addresses associated with a scam cluster tied to the fraudulent platform "Truecommerce.live," which also sent funds to the Consolidation Address. There are also several scam clusters associated with at least five fraudulent domains that transacted with 0x9543B4 but did not transact with the Consolidation Address.

94.     A chart detailing the total loss victims K.B., K.H., and G.P. each suffered, together with the portion of those losses traceable to the Subject Address A, is shown below in Figure 11.

*Figure 11*

| Victim | Loss Traced (USDT) | Total Reported Loss ($) |
|---|---|---|
| K.B. | 98,686 | $400,000 |
| K.H. | 29,000 | $675,000 |
| G.P. | 56,542 | $182,000 |
| **TOTAL** | 184,228 | $1,257,000.00 |

///

///

///

**Freeze of Subject Addresses and Seizure of Defendant Property**

95.     On or about July 25 and 28, 2025, respectively, Tether attempted to voluntarily freeze[11] the USDT in Subject Addresses A and B, then valued at approximately 4.5 million USDT.

96.     Subject Addresses A and B are unhosted wallet addresses the owner(s) of which cannot be easily identified. Pursuant to a law enforcement request, Tether voluntarily froze Subject Currency A (approximately 3,034,907.00 USDT) and Subject Currency B (approximately 490,036.01 USDT) associated with Subject Addresses A and B, respectively.

97.     Following the freeze, an individual using the moniker J.P.K.[12] contacted investigators and inquired why J.P.K.'s USDT wallet, Subject Address B, was blacklisted. On October 22, 2025, investigators responded to J.P.K. and asked for more information, including proof of address ownership, the intended uses for the address, and any information J.P.K. had regarding the source of the funds. J.P.K. has not responded to the questions.

98.     On or about November 28, 2025, the United States obtained a warrant to seize the Defendant Property for forfeiture. Pursuant to the warrant, on or about April 7, 2026,, Tether burned Subject Currency A (approximately 3,034,907.00 USDT) and Subject Currency B (approximately 490,036.01 USDT) associated with Subject Addresses A and B, respectively, and reissued the equivalent value of USDT tokens (the Defendant Property) to a United States law enforcement-controlled virtual currency wallet.

---

[11] Freezes implemented by Tether prevent wallet addresses from transferring USDT to other addresses. Tether only has the capability to "freeze" the USDT residing within these accounts and is unable to impact other cryptocurrencies that the wallet address manages. From here on out, statements regarding freezes of addresses will not differentiate between tokens and will always be referring to the USDT balance.

[12] The name of the person claiming ownership of the address is anonymized to protect their identity.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(C))

99.     The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

100.     Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

101.     The Defendant Property constitutes property involved, or traceable to property involved in, (a) domestic and international concealment of money laundering transactions committed in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i); and (b) a conspiracy to engage in money laundering, committed in violation of 18 U.S.C. § 1956(h).

102.     Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

Jehiel Baer
WSBA No. 46951
Assistant United States Attorney
United States Attorney's Office
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-4169
Jehiel.baer@usdoj.gov

*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

**VERIFICATION**

I, Charles Linnerooth, a Special Agent with the United States Department of Justice, Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 23rd day of April, 2026.


*Charles Linnerooth*
_____
CHARLES LINNEROOTH
Special Agent
Federal Bureau of Investigation